UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| INTERNATIONAL GAME TECHNOLOGY PLC *and* IGT GLOBAL SOLUTIONS CORPORATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK B. GARLAND, *in his official capacity as Attorney General of the United States*; *and* THE U.S. DEPARTMENT OF JUSTICE,<br><br>*Defendants.* | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiffs International Game Technology PLC and IGT Global Solutions Corporation (collectively, "IGT") submit this Complaint for Declaratory Relief.

**INTRODUCTION**

1. This action challenges a 2018 opinion issued by the Office of Legal Counsel ("OLC") at the U.S. Department of Justice ("DOJ"). In an analogous action brought by the New Hampshire Lottery Commission and one of its vendors, the First Circuit held earlier this year that "the controversy … [wa]s justiciable and that the Wire Act's prohibitions are limited to bets or wagers on sporting events or contests." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 45 (1st Cir. 2021) ("*New Hampshire II*"). That holding controls this case, and DOJ's deadline to seek further review of *New Hampshire II* has expired.

2. In 2018, OLC issued an opinion declaring that certain provisions of the Wire Act of 1961 apply to all forms of bets or wagers.[1] That opinion reversed a 2011 opinion from the same office concluding that the Wire Act applies only to sports betting, and that neither the Wire Act nor the Unlawful Internet Gambling Act ("UIGEA") prevents states from selling lottery tickets over the internet.[2]

3. Because virtually all modern lottery and gaming relies on interstate wires, and because the lottery and regulated gaming industries were built around the understanding that the Wire Act poses no impediment to those state-regulated activities, the New Hampshire State Lottery Commission and its lottery services provider, NeoPollard, challenged the 2018 OLC Opinion in federal court. Both the district court and the First Circuit agreed with the plaintiffs about the scope of the Wire Act. *N.H. Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132 (D.N.H. 2019) ("*New Hampshire I*"); *New Hampshire II*, 986 F.3d 38. Because relief was limited to the plaintiffs in that case, however, the 2018 OLC Opinion remains DOJ's binding policy today. *See New Hampshire II*, 986 F.3d at 62.

4. As a result, IGT's entire non-lottery gaming business is subject to prosecution, and DOJ has offered only the promise of a 90-day heads up before it can subject IGT's lottery business to the Wire Act as well. IGT therefore seeks a declaratory judgment that, under *New Hampshire II*, the Wire Act does not apply to IGT's non-sports gaming operations.

---

[1] *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. __ (2018) (the "2018 OLC Opinion"). This new opinion was not released until January 14, 2019.

[2] *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act*, 35 Op. O.L.C. 134 (2011) (the "2011 OLC Opinion").

## PARTIES

5. Plaintiff International Game Technology PLC ("IGT PLC") is a public limited company established under the laws of England and Wales, with its principal place of business in London, England. On its own and through its subsidiaries, IGT PLC provides products and services to every sector of the regulated lottery and gaming industries around the world.

6. Plaintiff IGT Global Solutions Corporation ("IGT GS Corp.") is a Delaware corporation with its principal place of business in Providence, Rhode Island. IGT GS Corp. is an indirect, wholly owned subsidiary of IGT PLC that provides technology, management and other services to 37 (out of 46) state lotteries (including the District of Columbia), and including three state lotteries that sell tickets over the Internet ("iLottery").

7. Defendant Merrick B. Garland is sued in his official capacity as Attorney General of the United States. The Attorney General is the head of the U.S. Department of Justice and is responsible for administering the laws of the United States, including the Wire Act.

8. Defendant the U.S. Department of Justice is an executive department of the United States of America that is responsible for administering the laws of the United States, including the Wire Act. OLC is a component of the DOJ and has delegated authority to issue official legal opinions that are binding on DOJ. *See* 28 C.F.R. § 0.25. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are agencies or employees of the United States, and IGT GS Corp. resides in the judicial district. Additionally, venue is proper under 28 U.S.C. § 1391(e)(1)(B) because

Defendants are agencies or employees of the United States, and a substantial part of the events or omissions giving rise to IGT's claims occurred in this judicial district.

11. This case is justiciable under Article III of the U.S. Constitution.

   a. IGT has standing to bring this Action because it uses wire communication facilities for the interstate transmission of non-sports bets and wagers and therefore faces an imminent threat of prosecution. *See New Hampshire II*, 986 F.3d at 49–52; *infra* at ¶¶ 52–56.

   b. The case is ripe because IGT "should not have to operate under a dangling sword of indictment while DOJ purports to deliberate without end the purely legal question it had apparently already answered and concerning which it offers no reason to expect an answer favorable to [IGT]." *See New Hampshire II*, 986 F.3d at 52–53.

   c. DOJ's April 2019 Memo, advising that the Wire Act should not be applied to state lotteries or their vendors until DOJ has issued guidance on that topic, and that any determination by DOJ that the Wire Act applies to state lotteries or their vendors would include a 90-day forbearance period,[3] "d[oes] not moot the case." *See New Hampshire II*, 986 F.3d at 53.

12. The Court is authorized to award the requested relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

---

[3] *See* Rod A. Rosenstein, Deputy Att'y Gen., U.S. Dep't of Just., *Notice Regarding Applicability of the Wire Act, 18 U.S.C. § 1084, to State Lotteries and Their Vendors* (Apr. 8, 2019), *available at* https://glms-sport.org/wp-content/uploads/2019/04/2019-04-08-DAG-Memo-State-Lotteries.pdf (the "April 2019 Memo"); Jeffrey Rosen, Deputy Att'y Gen., U.S. Dep't of Just., *Updated Directive Regarding Applicability of the Wire Act, 18 U.S.C. § 1084, to Non-Sports Gambling* (June 11, 2020), https://www.justice.gov/opa/press-release/file/1285321/download.

## LEGAL AND STATUTORY BACKGROUND

13. In 1961, Congress passed the Wire Act, which provides in relevant part:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a).

14. In 2002, the Fifth Circuit unanimously held that the Wire Act "clearly requires that the object of the gambling be a sporting event or contest." *In re MasterCard Int'l Inc.*, 313 F.3d 257, 262–63 & n.20 (5th Cir. 2002).

15. A few years later, "after a substantial amount of commerce had moved to the internet," *New Hampshire II*, 986 F.3d at 45, DOJ was asked whether the Wire Act prohibited a state-run lottery from using the internet to sell in-state tickets or from transmitting lottery data associated with in-state ticket sales to an out-of-state transaction processor. In 2011, OLC issued a memorandum confirming the consensus view that "the Wire Act prohibits only the transmission of communications related to bets or wagers on sporting events or contests." 35 Op. O.L.C. at 137–38.

16. In 2017, the Coalition to Stop Internet Gambling ("CSIG"), a lobbying group funded by a land-based casino owner and political donor, sent a memorandum to the DOJ arguing that the 2011 OLC Opinion was wrong and advocated for a change.[4]

---

[4] *See* Tom Hamburger, *Justice Department Decision to Issue Legal Opinion Long Sought by Casino Magnate Sheldon Adelson Draws Criticism*, Wash. Post (Feb. 7, 2019), https://www.washingtonpost.com/politics/justice-department-decision-to-issue-legal-opinion-long-

17. On November 2, 2018, OLC issued a new opinion that substantially adopted the argument advanced in CSIG's 2017 memorandum. DOJ publicly released the new opinion on January 14, 2019. The 2018 Opinion construed § 1084(a) as containing "two general clauses, each of which prohibits two kinds of wire transmissions, creating four prohibitions in total." 2018 OLC Op. 3. Of these four prohibitions, OLC decided that only one (the second) is limited to sports betting.

18. In a related memorandum issued the day after the 2018 OLC Opinion was published, the Deputy Attorney General adopted the 2018 OLC Opinion as "the Department's position on the meaning of the Wire Act."[5] In recognition of reliance interests based on the 2011 OLC Opinion, the Deputy Attorney General granted a 90-day forbearance period to allow gaming operators "to bring their operations into compliance with federal law." DOJ has never withdrawn the Deputy Attorney General's statement that the 2018 OLC Opinion reflects DOJ's official interpretation of the Wire Act.

19. On February 15, 2019, the New Hampshire Lottery Commission and NeoPollard sued the Attorney General and DOJ in the U.S. District Court for the District of New Hampshire.

20. In a series of memoranda, the Deputy Attorney General extended the forbearance period through December 1, 2020. The Deputy Attorney General also advised that the Wire Act should not be applied to state lotteries or their vendors until DOJ issued further guidance on that subject.

---

sought-by-casino-magnate-sheldon-adelson-draws-criticism/2019/02/07/fb705da6-2ae8-11e9-b011-d8500644dc98_story.html?utm_term=.ed16160c1831.

[5] Rod A. Rosenstein, Deputy Att'y Gen., U.S. Dep't of Just., *Applicability of the Wire Act, 18 U.S.C. § 1084, to Non-Sports Gambling* (Jan. 15, 2019), https://www.justice.gov/file/1124286/download.

21. On June 3, 2019, the district court granted summary judgment in favor of the New Hampshire Lottery Commission and NeoPollard, holding that the Wire Act applies only to bets or wagers on sporting events and contests. In its decision, the district court declared that the Wire Act does not apply to either plaintiff's non-sports betting operations and ordered the 2018 OLC Opinion to be set aside under the Administrative Procedure Act ("APA").

22. On January 20, 2021, the First Circuit agreed that "the prohibitions of section 1084(a) apply only to the interstate transmission of wire communications related to any 'sporting event or contest'" but vacated the district court's decision to set aside the 2018 Opinion under the APA. *New Hampshire II*, 986 F.3d at 61–62.

23. The forbearance period for non-lottery wire-based gaming expired on December 1, 2020.

24. DOJ's deadline to seek certiorari in *New Hampshire II* expired on June 21, 2021.

## FACTUAL BACKGROUND

**A.    IGT Provides a Broad Range of Gaming Products and Services to State and Private Partners.**

25. IGT is the world's largest end-to-end gaming company and the largest gaming and lottery services provider in the United States, offering its state, commercial, and tribal partners the most extensive gaming content library in the world. IGT operates and provides an integrated portfolio of innovative technology products and services across all sectors of the regulated lottery and gaming industry. These products and services include business-to-customer operations, such as running state lotteries and building gaming machines, and business-to-business technological systems that help IGT's partners make lottery and gaming more efficient, secure, and enjoyable. In total, IGT's U.S. based operations employ more than 5,450 individuals.

26. In 2015, IGT became the first lottery vendor to be recognized for compliance with the World Lottery Association's Responsible Gaming Standards for Associate Members. This certification covers IGT's Lottery Operations. In 2017, IGT became the first gaming vendor to achieve responsible gaming accreditation from the Global Gambling Guidance Group (G4) for its gaming operations. IGT also received G4 Digital certification in 2019. These and other awards demonstrate IGT's commitment to responsible and legal gaming.

        1.     **Lottery**

27. Over the last three years, on average, approximately 62% of IGT's annual revenue from continuing operations comes from providing products and services, including comprehensive management services, to state lotteries. IGT provides physical equipment (tickets, terminals, vending machines, transaction processing systems, communications equipment and more) and/or operational services to approximately 90 customer jurisdictions worldwide, including for 37 of the 46 U.S. lotteries.

28. One of those lotteries is in Rhode Island, where IGT's U.S. lottery business is headquartered and is one of the state's largest employers. IGT and its predecessor, GTECH Corporation, have provided lottery services to the Rhode Island Lottery since 1980, and IGT's data center in Rhode Island is the primary or secondary data center for seven state lotteries nationwide.

29. IGT offers both instant and draw-based lottery games within single states and across multiple states.

    a. Instant games, commonly known as scratch-off tickets, are the most popular form of lottery gaming. Each instant-draw ticket has a predetermined outcome printed on the ticket that is revealed by scratching off the face of the card. While these outcomes are predetermined at the time the ticket is printed, IGT stores the outcome of

8

each card on central servers, which are located in multiple states across the country and are used to activate the ticket for sale, to validate that winning cards are legitimate, and to authorize payment for winning cards.

  b. IGT also offers a variety of draw-based games, which determine winners by matching numbers selected by, or randomly assigned to, players. The core of most states' draw-game portfolio are jackpot games, where numbers are drawn from machines (often on broadcast television) at a predetermined time each day or on certain days of the week. For example, in Rhode Island, IGT provides operational services for the Numbers Game, which has daily midday draws uploaded to the RI Lottery's YouTube channel after the afternoon drawing and daily evening draws uploaded to YouTube as well as broadcasted on WPRI-TV.

  c. In addition to state-specific games, IGT also provides operational support for multistate jackpot games. The two most popular multistate jackpot games, Powerball and Mega Millions, are both offered in 46 U.S. jurisdictions, including Rhode Island. All of the states join together to pool players, lottery numbers, and prize money in order to offer larger jackpots that can total into the billions.

30. IGT's contracts with individual state lotteries take different forms depending on the state's needs and offerings.

  a. In 25 states, IGT's contract is a facilities management contract, which means IGT is typically responsible for designing, installing, and operating all technology and facilities used for retail lottery. This includes building, installing, and maintaining a state-wide network of lottery terminals and related communication networks that ensure all lottery purchases are registered instantly, accurately, and securely. In some of these

states, IGT also provides additional services, such as warehousing, distribution, marketing, retail development, and other management and operational services.

  b. IGT also has product and service arrangements in place with lotteries in 12 additional U.S. jurisdictions. The most common service IGT provides under these agreements is ticket printing.

31. In addition to these traditional retail lottery offerings, IGT has been a leader in the emerging iLottery sector. iLottery is simply a twenty-first-century application of the traditional lottery business model. iLottery tickets are sold by state lottery commissions to people physically present in the state, which IGT ensures through geolocation technology. IGT currently provides iLottery services for Georgia, Kentucky, and Rhode Island.

32. IGT's state partners often designate lottery revenues for particular purposes, such as education, economic development, conservation, transportation, and health care.

  **2. State-Regulated, Casino-Style Gaming**

33. IGT is also a leading manufacturer and operator of gaming machines, and its gaming machines are found in many of the largest casinos in the United States.

34. IGT offers both centrally determined games, which are connected to a central server that determines the outcome of the game, and games (like slot machines) that are randomly determined by the operation of the machine itself.

  a. As of August 2021, IGT operated over 3,900 centrally determined games across North America. In these games, each time a machine is played, the player is randomly assigned a predetermined outcome from the central server. Operating these machines requires data communications between the machine and the central server that stores the predetermined outcomes. IGT's centrally determined games are generally set up on local area networks ("LANs") housed on the property where the machine is

located.  That means that the bet itself is placed at the machine, while the communication entitling a winner to money goes from the server to the machine over the LAN.  Interstate wire facilities are used to report information about what has occurred at the machines and within the casinos—for example, that a certain number of bets were placed.

  b. Randomly determined machines are also generally structured so that outcomes and payouts are generated at the machine itself.  In a slot machine, for example, the bet is made when the player pulls the handle, and the determination of outcome and payout is usually made by a random number generator within the slot machine itself.  The bet never leaves the slot machine, and the communication that entitles winning players to money comes from the slot machine as well (either through a printout or by uploading the win to a player card).  All that leaves the slot machine are accounting and analytical reports of all activity on the slot machine.

  c. Some slot machines are structured as wide-area progressives ("WAPs"), where a single jackpot is pooled across multiple casinos and progressively grows or reduces based on payouts.  Such a system allows casinos to offer larger jackpots to players while hedging the risk of such a substantial payout across multiple casinos.  These slot machines are necessarily connected by a data network, which incrementally grows the jackpot as wagers are placed at connected slot machines and reduces the jackpot after large payouts.  As of August 2021, IGT had an installed base of approximately 3,800 WAP slot machines, which generate approximately $169 million in annual revenue.

35. Most of IGT's gaming machines are sold to commercial and tribal casinos, but IGT also operates some machines under contract with state agencies.

### 3. State-Regulated iGaming

36. As an outgrowth of its land-based gaming properties, IGT also enables its gaming partners to offer popular casino games over the internet to players' computers or mobile devices. Through IGT's solutions, players can play casino games for fun (social gaming) and, in states where it is legal, for money (interactive gaming, or iGaming).

37. iGaming is currently legal and operational in six states (Delaware, Michigan, New Jersey, Nevada, West Virginia, and Pennsylvania) . As with iLottery, IGT's iGaming products use geolocation technology to ensure that players are physically present in the state where the gaming is legal.

38. In IGT's existing architectural approach for iGaming, a player begins by registering in the Player Account Management System ("PAM"). The player then places a wager and plays on a Gaming Platform. If the player wins, the Gaming Platform passes along that information to the PAM. The PAM then passes a request for a deposit through a Payment Gateway to the operator's bank account. The winnings are then passed from the operator's bank account to the player's bank account through the Automated Clearing House ("ACH") network. The different parts of IGT's iGaming structure—such as the Gaming Platform, Player Account Management System, and Payment Gateway—may all be located in different states.

### B. DOJ's New Interpretation of the Wire Act and Subsequent Activity Has Upended Industry Expectations and Poses a Credible Threat of Prosecution.

39. The lottery and gaming industry, including IGT and its state partners, developed around a shared understanding that sports betting was the Wire Act's sole concern. The 2018 OLC Opinion fundamentally imperils that understanding, and IGT's businesses and partners face a credible threat of prosecution.

### 1. The OLC Opinion Threatens All Aspects of State Lotteries and Regulated Commercial Gaming.

40. OLC's reinterpretation threatens both state lotteries and the commercial gaming industry.

41. As for lottery, that threat applies to both retail lottery and iLottery. While retail lottery tickets are purchased at a retail counter, vending machine, or some other physical location, those ticket sales rely on interstate wire transmissions both at the time the ticket is purchased and at the time winning tickets are redeemed. Specifically, when a customer purchases a lottery ticket from a retail vendor, that purchase typically is entered into a lottery-specific terminal that routes the purchase to a central data center, which authorizes the wager and allows the vendor to issue the ticket.

42. Most state lottery contracts further require wagers to be routed through a secondary data center in a different state, or at least a sufficient distance apart from one another in the same state. This structure is in line with industry best practices to ensure uninterrupted service in the event of outages or natural disasters that impact one of the data centers. Even when the data centers are all located in the same state, those transmissions are routed through data and telephone networks maintained by telecommunications companies, and thus IGT has little control over how the communications are transmitted to and from the data centers.

43. Shortly after the 2018 OLC Opinion was released, the North American Association of State and Provincial Lotteries ("NASPL") issued a press release stating that "DOJ's reinterpretation of the Wire Act creates substantial uncertainty concerning the legal status of lottery transactions, including … critical enhancements and improvements, many of which were made in reliance on the 2011 opinion, and the related contractual obligations and the industry's ability to provide critically needed funding for important public interests." Press

Release, NASPL, *NASPL Responds to the DOJ Reversal of Opinion* (Feb. 1, 2019), https://bit.ly/3pSbyGw.

44. In addition, all states with lotteries (as well as the District of Columbia) now participate in multi-jurisdictional lottery games such as Mega Millions and Powerball. These games necessarily rely on interstate wire transmissions to place and register bets, to validate wins, and to authorize payments. The director of Mega Millions stated that the 2018 Opinion places these "hugely popular games … at risk, … along with every other lottery draw game." Tony Batt, *Memo on Multistate Lotteries Draws Scathing Response*, Gambling Compliance (Mar. 14, 2019).

45. As for state-regulated gaming, OLC's new interpretation similarly puts both traditional land-based gaming and iGaming at risk.

46. Land-based gaming is intended to be an intra-state (indeed, intra-casino) activity. A person sitting at a gaming machine or card table places her bets and receives her winnings at the machine or table. As is unavoidable in the modern economy, however, table and machine gaming often rely on intermediate data transmissions to support the in-person gaming activity. IGT provides thousands of gaming machines at casinos and racinos nationwide. To track wins, detect fraud, and hedge risk across multiple machines or even casinos, most or all gaming machines are connected to data servers. IGT's machine games are also connected to each other over data networks to register bets, determine outcomes, authorize payments, and track progressive jackpots.

47. OLC's new opinion unquestionably targets IGT's investments in iGaming too. iGaming necessarily uses a channel of interstate commerce (the internet), even though IGT has

invested in state-of-the-art technology to ensure that the bettor is physically present in the state where the lottery or casino game is offered.

### 2. The Gaming Industry Relied on the Settled Interpretation of the Wire Act, and the Cost of Change to Attempt to Comply with the New Opinion Would Be Overwhelming and Debilitating.

48. IGT and its state partners have relied significantly on the settled understanding that the Wire Act covers only sports betting and does not cover lotteries or state-regulated gaming. In iLottery, for example, the two states that asked for guidance from DOJ back in 2009 (New York and Illinois) contracted with IGT to launch iLottery, and other states have since followed suit. In state-regulated gaming, including IGT gaming machines, huge amounts of money have been spent based on the understanding that the Wire Act does not criminalize most of Las Vegas, Atlantic City, and other jurisdictions (such as Rhode Island) with legal casino gaming.

49. The compliance cost for the industry of converting all lottery networks to use only intrastate data transmissions, moreover, would be prohibitive. For IGT, these costs would include:

- the lost book value of existing data and communications networks;
- new capital expenditures to replace existing data centers, communications networks, and call centers;
- additional operational expenses due to redundant and less efficient technology;
- lost profits during the time lottery games are offline so compliance measures can be implemented; and
- lost profits from not being able to offer multijurisdictional games like Powerball and Mega Millions.

50.     There would also be secondary costs, like lost value of contracts and IP licenses while IGT is undergoing changes, being forced to lay off employees, and losing goodwill with customers and with the rest of the gaming community.

51.     Compliance costs would also be devastating for IGT's state partners.  Lotteries are an important source of state revenue:  in fiscal year 2020 alone, state lotteries generated over $25.3 billion in revenue for state budgets, which was spent to fund public education, infrastructure projects, environmental conservation, indigent representation, police and firefighters' pensions, teacher retirement programs, and other good causes.  *See La Fleur's 2020 World Lottery Almanac* 23–25 (28th ed. 2020).  If lotteries were suddenly illegal or forced to shut down for a prolonged period during restructuring, states would have to scramble to replace millions or even billions of dollars of state revenue.  The resulting tax hikes and service reductions would no doubt force state officials to feel the brunt of unpopular federal policy choices.

### 3.     **IGT Has a Credible Fear of Prosecution.**

52.     As the First Circuit held, gaming operators such as IGT face a credible threat of prosecution that poses a present and identifiable hardship as a result of OLC's new interpretation of the Wire Act.

53.     IGT "use[s] wire communication facilities for the interstate transmission of bets and wagers in the running of" lotteries and iLottery.  *New Hampshire II*, 986 F.3d at 50.

54.     "The 2018 Opinion, which adopted a broad reading of activities prohibited by section 1084(a), expressly mentions such lotteries, suggesting that Congress need amend the statute if it wishes to protect reliance interests, including those of the states.  Removing any doubt regarding the enforcement of its new view, DOJ's subsequent memoranda made clear that

16

DOJ attorneys must 'adhere' to that view, and that any discretionary forbearance was limited to a brief window of time." *Id.*

55. "DOJ affirmatively warned a state that it believed selling lottery tickets over the internet violated the Wire Act and, in the lead-up to the 2011 Opinion, provided similar advice to inquiring authorities from two states." *Id.* at 51.

56. The April 2019 Memo did not change the credible threat of prosecution. Rather, the government has "exacerbate[d] the threat posed by its prolonged coyness by limiting its professed forbearance to ninety days from whatever date it decides to opine." *Id.* at 52.

## CAUSE OF ACTION

### COUNT ONE
### DECLARATORY JUDGMENT
### (Wire Act Applies Only to Sports Betting)

57. Plaintiffs incorporate the foregoing paragraphs as if set forth herein.

58. The First Circuit held that the Wire Act, in its entirety, "appl[ies] only to the interstate transmission of wire communications related to any 'sporting event or contest.'" *New Hampshire II*, 986 F.3d at 61–62. The First Circuit has also held that a lottery services provider (analogously situated to IGT) has standing to challenge the 2018 OLC Opinion, and that the case is otherwise justiciable. *Id.* at 49–54.

59. The First Circuit's jurisdictional and merits holdings in *New Hampshire II* are correct and controlling on this Court.

60. OLC's new interpretation of the Wire Act puts IGT to the choice of either fundamentally restructuring (or closing) its business, or risking a federal felony prosecution. Based on this severe and present hardship, IGT requests a declaratory judgment that the 2018 OLC Opinion is contrary to law and that the Wire Act applies only to "bets or wagers on any sporting event or contest."

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks the Court to order the following relief:

A. Declare that the Wire Act applies only to "bets or wagers on any sporting event or contest";

B. Award costs and reasonable attorney fees as appropriate and to the extent permitted by law; and

C. Enter such other relief as this Court may deem just and proper.

Respectfully submitted,

INTERNATIONAL GAME TECHNOLOGY PLC
*and* IGT GLOBAL SOLUTIONS CORPORATION

By its Attorneys:

*Mark Hichar*

Mark Hichar (Bar No. 6520)
David C. Fixler (Bar No. 3839)
GREENBERG TRAURIG, LLP
One International Place, Suite 2000
Boston, MA  02110
T: 617-310-6000
hicharm@gtlaw.com
fixlerd@gtlaw.com

Jonathan F. Cohn*
Joshua J. Fougere*
Daniel J. Hay*
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T:  (202) 736-8000
F:  (202) 736-8711

* *pro hac vice* forthcoming

Dated:  November 23, 2021