UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
INTERNATIONAL GAME TECHNOLOGY           )
PLC, and IGT GLOBAL SOLUTIONS           )
CORP.,                                  )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )    C.A. No. 21-463 WES
                                        )
MERRICK B GARLAND and                   )
THE UNITED STATES DEPARTMENT            )
OF JUSTICE,                             )
                                        )
          Defendants.                   )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

The substantive question of statutory interpretation at the center of this case – whether the Wire Act of 1961[1] reaches non-sports betting – has been definitively decided in the First Circuit.  See N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 45 (1st Cir. 2021) ("NHLC II").  Plaintiffs, International Game Technology PLC ("IGT PLC") and IGT Global Solutions Corporation ("IGT GS Corp.") (together, "IGT"), seek for themselves what the plaintiffs in NHLC II obtained: a declaratory judgment that the Department of Justice may not prosecute them for non-sports betting under the Wire Act.  See id.; Compl. ¶ 60, ECF No. 1.  In response, Defendants Attorney General Merrick Garland and the U.S. Department of Justice

_____
[1] See 18 U.S.C. § 1084(a).

("DOJ") moved to dismiss under Rule 12(b)(1), arguing that the expiration of a DOJ forbearance period without like prosecutions and the existence of the NHLC II decision itself render the threat of future prosecutions too speculative an injury to confer Article III standing.

Before the Court are Defendants' Motion to Dismiss for Lack of Jurisdiction, ECF No. 14, and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 16.  For the reasons that follow, Defendants' Motion to Dismiss is DENIED, and Plaintiffs' Motion for Summary Judgment is GRANTED.

I.   BACKGROUND

A.   Plaintiffs' Operations

Based in London, England, Plaintiff IGT PLC is the world's largest end-to-end gaming company.  Compl. ¶¶ 5, 25.[2]  Plaintiff IGT GS Corp. is its wholly owned U.S. subsidiary and the largest provider of gaming and lottery services in the United States.  Id. ¶ 6.  IGT GS Corp. is organized under the laws of Delaware and has its principal place of business in Providence, Rhode Island.  Id. It provides technical support, equipment, and management services to thirty-seven out of forty-six state lotteries, including three

---

[2] To color the background of the case, the Court draws on the well-pleaded facts of the Complaint and the undisputed facts submitted for summary judgment, and takes notice of some relevant procedural history discussed in N.H. Lottery Comm'n v. Rosen, 986 F.3d 38 (1st Cir. 2021).

states which sell tickets through the internet ("iLottery").  Id.
IGT's data center in Rhode Island is the primary or secondary data
center for seven state lotteries.  Id. ¶ 28.  IGT is also a leading
manufacturer and operator of casino-style gaming machines, like
slot machines.  Id. ¶ 33.  Some of these gaming machines allow for
the pooling of jackpots across multiple casinos using a data
network.   Id. ¶ 34(c).  Finally, IGT offers internet-based
gambling, so-called "iGaming", in the six states in which it is
legal to do so for money.  Id. ¶¶ 36-37.  iGaming, like these other
services, requires the use of wires to transmit data across state
lines, and thus perhaps falls within the reach of the Wire Act.
Id. ¶ 38.

     B.   Shifting Interpretations of the Wire Act

     IGT's standing hinges, in large part, on the likelihood of
its criminal prosecution under the Wire Act.  It is necessary,
therefore, to recount in some detail the history of the DOJ's
shifting interpretations as to the scope of Wire Act and the NHLC
litigation which precedes this case.

     The relevant section of the Wire Act includes four related
clauses.  Each prohibits different aspects of making bets and
wagers using wire communications that cross state lines.[3]   The

---

[3] The statute provides:

Whoever being engaged in the business of betting or
wagering knowingly uses a wire communication facility
for the transmission in interstate or foreign commerce

second prohibitional phrase is explicitly limited to "bets or wagers on any sporting event or contest." See 18 U.S.C. § 1084(a). The pivotal question at issue in various DOJ opinions and in NHLC II was whether the whole statute is limited to sports betting, or whether the limiting language applies only to the second prohibition, such that the rest of the statute criminalizes non-sports betting. NHLC II, 986 F.3d at 45 ("The question the parties present to us is whether the phrase 'on any sporting event or contest' (the 'sports-gambling qualifier') qualifies the term 'bets or wagers' as used throughout section 1084(a).").

Until 2011, the DOJ took the position "that the Wire Act is not limited to sports wagering and can be applied to other forms of interstate gambling." See Whether the Wire Act Applies to Non-Sports Gambling, 35 Op. O.L.C. 134, 136 (2011) ("2011 OLC Opinion"); NHLC II, 986 F.3d at 45-46. This was not merely an academic question. Between 2005 and 2011, the DOJ prosecuted at least seventeen cases of non-sports betting under the Wire Act. NHLC II, 986 F.3d at 50. In 2009, the DOJ responded to inquiries

---

of [1] bets or wagers or [2] information assisting in the placing of bets or wagers on any sporting event or contest, or [3] for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or [4] for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a).

from New York and Illinois about their plans to use IGT's internet-based lottery systems. Id. at 45; see also Compl. ¶ 48. It made clear that under its view of the Wire Act, these systems were criminal. NHLC II, 986 F.3d at 45-46.

At the same time, the DOJ Criminal Division recognized a tension between its position on state lotteries and specific statutory carve outs for state lotteries created by Congress in a 2006 statute.[4] As a result, it sought further guidance from the DOJ's Office of Legal Counsel ("OLC") as to whether the Wire Act reached internet-connected state lotteries. Id. The OLC responded by reversing its prior position about the scope of the Wire Act. It concluded that "the Wire Act does not reach interstate transmissions of wire communications that do not relate to a 'sporting event or contest.'" 2011 OLC Opinion 151. In other words, it determined the Wire Act only prohibits sports betting; the state lotteries, along with other forms of non-sports, interstate gambling, were safe from prosecution.

IGT, and the gaming and lottery industry more broadly, relied on this guidance as their business developed. Compl. ¶¶ 48-51. As noted, many aspects of IGT's business now involve non-sports betting, including its land-based gaming machines, iGaming, iLottery systems, and even its more traditional state lotteries,

---

[4] The Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367.

which verify and authorize ticket purchases through interstate wire transmissions.  Id. ¶¶ 40-47.

In 2017, the DOJ Criminal Division asked the OLC to reconsider its position.  See NHLC II, 986 F.3d at 46.  OLC did so, and ultimately reverted to its pre-2011 position, concluding that the Wire Act reached non-sports betting, like lotteries and internet-connected slot machines.  See Pls.' Statement Undisp. Facts Supp. Cross-Mot. Summ. J. ¶ 1 ("Pls.' SUF"), ECF No. 16-2 (citing Reconsidering Whether the Wire Act Applies to Non-Sports Gambling, 42 Op. O.L.C. __, 2018 WL 7080165 (Nov. 2, 2018) ("2018 OLC Opinion")).  In this latest opinion, the OLC "justified its reversal on the grounds that the 2011 Opinion did not devote adequate attention to either the text of the statute or the canons of statutory construction, was 'of relatively recent vintage,' and departed from DOJ's former position."  NHLC II, 986 F.3d at 46 (citing 2018 OLC Opinion 14).  The Deputy Attorney General adopted this opinion as the DOJ's position on January 15, 2019.  Pls' SUF ¶ 2.

C.  NHLC Litigation

In response to the 2018 OLC Opinion, the New Hampshire Lottery Commission and its vender, NeoPollard (an IGT competitor), sought both a declaratory judgment that the Wire Act applied only to sports betting and an order under the Administrative Procedure Act

("APA") setting aside the 2018 OLC Opinion.[5]  See N.H. Lottery Comm'n v. Barr, 386 F. Supp. 3d 132, 136 (D.N.H. 2019) ("NHLC I"), aff'd in part, vacated in part sub nom. N.H. Lottery Comm'n v. Rosen, 986 F.3d 38 (1st Cir. 2021).  In a thorough order, the district court held that the threat of prosecution was significant enough to confer standing, id. at 140-45, and that, as a matter of statutory interpretation, the Wire Act only criminalizes sport betting, id. 147-57.  As a remedy, the court entered a declaratory judgment that "binds the United States vis-à-vis NeoPollard and the [NHLC] everywhere the plaintiffs operate or would be otherwise subject to prosecution," and ordered that the 2018 OLC Opinion be set aside under the APA.  Id. at 158-159.

On review, the First Circuit upheld the district court's order as to standing and its interpretation of the Wire Act.  NHLC II, 986 F.3d at 54-62; id. at 61-62 ("Like the Fifth Circuit, and the district court in this case, we therefore hold that the prohibitions of section 1084(a) apply only to the interstate transmission of wire communications related to any 'sporting event or contest.'").  However, it vacated the relief granted under the APA, concluding that declaratory relief was an adequate remedy under the circumstances.  Id.  Within the First Circuit therefore,

---

[5] The relevant portion of the APA states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

the ping-ponging question of the Wire Act's proper scope has been definitively answered.  That decision is of course binding on this Court, and independently compelling.  See NHLC II, 986 F.3d at 54-62 (closely analyzing text, competing statutory cannons, evident purpose, and legislative history to construe the Wire Act).

After the 2018 OLC Opinion was first challenged in the NHLC litigation, the DOJ announced two separate forbearance periods. The first pertained to the potential prosecution of state lotteries and their vendors.  It was set to expire ninety days after the DOJ issued additional guidance on whether it believes the Wire Act applies to state lotteries.  Pls.' SUF ¶ 4.  Even today, that promised guidance has not arrived, so state lotteries and their vendors (including IGT) operate within this indefinite forbearance period.  Id.

The second forbearance period concerned the DOJ's announcement that it would not bring Wire Act prosecutions for non-lottery gambling under the 2018 OLC Opinion until sixty days after the entry of final judgment in the NHLC litigation.  Id. ¶ 5.  IGT argues this period expired on August 20, 2021, sixty days after the expiration of the DOJ's deadline to seek an en banc rehearing of the First Circuit's decision or to seek certiorari. See Pls.' Mem. Supp. Cross-Mot. Summ. J. ("Pls.' SJ Mem.") 15-16, ECF No. 16-1.  (It sought neither.)  The DOJ notes that entry of final judgment in the district court case would have put the

expiration date much sooner, and points to subsequent forbearance period extensions issued by the Deputy Attorney General.   See Defs.' Reply Mem. Supp. Mot. Dismiss and Opp'n Pl's Cross-Mot. Summ. J. ("Defs.' Reply") 5, ECF No. 19.   The last of these memoranda was issued on June 11, 2020, and extended the moratorium to December 1, 2020, with no sixty-day qualification.   Id.   While the Court concludes that the DOJ has the better reading of its own memoranda, and therefore the non-lottery forbearance period ran on December 1, 2020, this dispute ultimately matters little.

II. LEGAL STANDARD

When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996).   The Court also "may consider whatever evidence has been submitted in the case." Acosta-Ramirez v. Banco Popular de Puerto Rico, 712 F.3d 14, 18 (1st Cir. 2013).   The burden of demonstrating subject matter jurisdiction falls on the plaintiffs.   Justiniano v. Soc. Sec. Admin., 876 F.3d 14, 21 (1st Cir. 2017).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).

III. DISCUSSION

    A.   Standing

The government contends that IGT does not face a credible threat of prosecution and therefore lacks standing, both because the DOJ has not brought like prosecutions after the non-lottery forbearance period ran out, and because NHLC II makes a successful prosecution of IGT impossible in the First Circuit. Neither argument is persuasive.

The doctrine of standing gives shape to Article III's case-or-controversy requirement by helping "identify those disputes which are appropriately resolved through the judicial process." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). To prove standing, the party invoking a court's jurisdiction must show, with evidence appropriate to the stage of the proceeding, that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). As in NHLC II, there is "no question that injury, if any, can be traced directly to the government's threatened enforcement of the Wire Act and can be redressed in this action." 986 F.3d at 50.

So, the pivotal inquiry becomes whether Plaintiffs can show an injury in fact. In general, an injury in fact "must be concrete and particularized and actual or imminent, not conjectural or

hypothetical." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (internal quotation marks and citations omitted). This requirement ensures "a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975).

      1.   Threatened Prosecution as an Imminent Injury

In the right circumstances, the threatened enforcement of a criminal law may be sufficiently "imminent" to constitute an Article III injury in fact. Reddy, 845 F.3d at 500. "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) ("SBA List"); see also MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.").

But plaintiffs so threatened must show more than that they intend to violate or are violating an existing law; they must also show that the threat of prosecution is sufficiently real to provide standing. "[J]ust how clear the threat of prosecution needs to be turns very much on the facts of the case and on a sliding-scale

judgment that is very hard to calibrate." N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 5 (1st Cir. 2000). "Courts have variably described the requisite likelihood of enforcement as 'sufficiently imminent,' 'credible,' 'substantial,' and 'realistic.'" NHLC I, 386 F. Supp. 3d at 141 (collecting cases).

Context matters in this sliding-scale inquiry. As evidence that a threatened prosecution is realistic and credible, courts have considered whether the plaintiff was previously threatened with arrest and prosecution by the law's enforcer, see, e.g., Steffel v. Thompson, 415 U.S. 452, 459 (1974) (specific threat of arrest and prosecution gave pre-enforcement standing), a history of like prosecutions, see Holder v. Humanitarian L. Project, 561 U.S. 1, 16 (2010); SBA List, 573 U.S. at 164, ("Past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'"), and a background "assumption that the state will enforce its own non-moribund criminal laws, absent evidence to the contrary," NHLC II, 986 F.3d at 51 (quoting Blum v. Holder, 744 F.3d 790, 798 n.11 (1st Cir. 2014)).

Threat of prosecution may be too illusory to support standing when there is an unequivocal statement disavowing the government's right to prosecute, Blum, 744 F.3d at 798 ("Particular weight must be given to the Government disavowal of any intention to prosecute . . . because it does not think [plaintiff's conduct] is prohibited by the statute."), a significant history of declining to prosecute

12

easily discovered conduct, id. (emphasizing "the lack of a history of enforcement of the challenged statute to like facts, [and] that no enforcement has been threatened as to plaintiffs' proposed activities"), or when a third-party's actions are a precondition of prosecution, and it is speculative as to whether that precondition will occur, Reddy, 845 F.3d at 502-03 (threat of prosecution too speculative when contingent on abortion clinics exercising statutory right to post "free speech buffer zones," something they had never done and represented that they did not intend to do because of intervening Supreme Court precedent).

2.   IGT's Threat of Prosecution

In the NHLC litigation, the DOJ contested standing before both the district court and the First Circuit.  Given the close parallels between that case and this one, any discussion of standing here should begin with the First Circuit's standing analysis in NHLC II.  Much of that analysis applies directly, and thus the Court has little difficulty concluding IGT has standing, despite the DOJ's attempts to distinguish the case.[6]

_____

[6] While the justiciability of this conflict is pitched by the parties in terms of standing, the Court must also assure itself that the matter is ripe.  "In the pre-enforcement context. . . the doctrines of standing and ripeness tend to overlap, so the Court's standing analysis largely applies here too."  NHLC II, 986 F.3d at 52 (internal quotation marks omitted).  In any event, ripeness requires a court to consider fitness and hardship.  "Fitness involves issues of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed,' while hardship 'typically turns upon

In NHLC II, the court began by noting that the plaintiffs were openly engaging in conduct branded as criminal by the DOJ's adoption of the 2018 OLC Opinion.   NHLC II, 986 F.3d at 50.   In those circumstances, any threat of prosecution does not have the added uncertainty of whether a plaintiff will follow through on a stated intention to violate the law; it is doing so already.   Here, broad swaths of IGT's business run afoul of the DOJ's latest interpretation of the Wire Act.   See id. (noting 2018 OLC Opinion "expressly mentioned [state] lotteries, suggesting that Congress need amend the statute if it wishes to protect reliance interests" and referring to memo that required DOJ attorneys to "adhere" to this view); Compl. ¶¶ 40-47 (detailing IGT operations that use wire communication to place non-sports bets across state lines). Like the NHLC plaintiffs, IGT "already ha[s] it all on the line, so to speak."   NHLC II, 986 F.3d at 51.   And while the parties dispute how long ago the DOJ's forbearance period for non-lottery enforcement expired, they agree that it has.   Thus, unlike the NHLC plaintiffs, IGT could be indicted tomorrow for its non-lottery business.   For its lottery business, IGT stands in the same

---

whether the challenged action creates a direct and immediate dilemma for the parties.'"   Id. at 53 (quoting R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999)). The Court finds this matter to be ripe.   The necessary facts are sufficiently developed and definite to render a proper judgment, and the threatened prosecution of much of its business operations poses an immediate dilemma for IGT.

position as the plaintiffs in NHLC; it could be prosecuted for its state lottery operations within ninety days of the DOJ announcing its new policy.

The DOJ argues that IGT's continued, open violation of the law (as the DOJ now describes it) implies that even IGT does not think a prosecution is imminent. That is not necessarily true. IGT's continued operation without the protection of a formal forbearance directive makes a prosecution more possible, not less. And the fact that IGT has not proactively dismantled most of its business in response to the legal uncertainty created by the DOJ's waffling should not be held against it. That IGT chose one prong of a harsh dilemma (the costs of drastically reconfiguring its business versus risking prosecution) does not mean that the threat of prosecution is a fiction. See NHLC II, 986 F.3d at 51 ("The rule that a plaintiff must destroy a large building, bet the farm, or . . . risk treble damages and the loss of 80 percent of its business before seeking a declaration of its actively contested legal rights finds no support in Article III." (quoting MedImmune, 549 U.S. at 134)).

In concluding that the NHLC plaintiffs had standing, the First Circuit also relied on record evidence that the "DOJ affirmatively warned a state that it believed selling lottery tickets over the internet violated the Wire Act and, in the lead-up to the 2011 Opinion, provided similar advice to inquiring authorities from two

states." Id. at 51.  The court directly compared these warnings
to those issued by the Drug Enforcement Agency ("DEA") in Hemp
Council, pointing out that it "found pre-enforcement standing
because the DEA had expressed its view that the conduct [the
plaintiff] sought to engage in violated federal law." Id. (citing
Hemp Council, 203 F.3d at 5).

The DOJ's warnings to New York and Illinois have even more
heft here, because those states partnered with IGT for the systems
the DOJ was reviewing.  See Compl. ¶ 48.  In other words, the last
time the DOJ held the position it now espouses, it specifically
told two of IGT's state partners that IGT's state lottery business
was criminal conduct.  And while the DOJ represents that it is
actively pondering this question, there is little mystery as to
why IGT finds the DOJ's protracted private musings to be cold
comfort.  These direct statements about IGT's business, which align
precisely with the formally adopted 2018 OLC Opinion, strongly
support the conclusion that IGT faces a realistic and substantial
threat of prosecution for its lottery business.

Finally, the NHLC II court supported its conclusion that
threat of prosecution was credible by noting that "when DOJ
attorneys last held the view expressed in the 2018 Opinion (between
2005 and 2011), DOJ had prosecuted seventeen cases involving non-
sports betting under the Wire Act." Id. at 50.  The DOJ asks the
Court to disregard these prosecutions, arguing that "[t]he

16

landscape of past enforcement actions is . . . entirely different"
because there is no evidence that it brought prosecutions in the
"nearly one year during which DOJ attorneys were not barred by any
forbearance directives from prosecuting non-sports betting." Mem.
Supp. Defs.' Mot. Dismiss for Lack Jurisdiction ("Mot. Dismiss")
10-11, ECF No 14-1. To be sure, this brief period during which
the DOJ could have prosecuted non-sports, non-lottery betting but
did not, lessens the weight of its pre-2011 prosecutions, but only
to a point. It does not constitute an "entirely different"
landscape. Even several years of declined prosecutions is hardly
a "realistic basis for a suggestion that the statutory provision
. . . has fallen into desuetude." NHLC II, 986 F.3d at 51 (quoting
R.I. Ass'n of Realtors, 199 F.3d at 32). The Court has no trouble
concluding that the DOJ's pre-2011 prosecutions reinforce that IGT
has standing here, even if the brief deferral period noted by the
DOJ undercuts the strength of that support.

While all this points to a rather straightforward application
of the standing analysis in NHLC II to the facts here, the DOJ
makes one other argument that the Court must address. The DOJ
contends that the very existence of NHLC II as a precedent
distinguishes IGT's situation from that of the NHLC plaintiffs.
This is so, the DOJ argues, because the holding in NHLC II prevents
any threat of IGT's successful prosecution anywhere in the First
Circuit, including in Rhode Island. See Mot. Dismiss 9-10 (quoting

NHLC II, 986 F.3d at 62) ("IGT faces no threat of successful prosecution in this District (or, for that matter, in any other District within the First Circuit) absent an overruling of [NHLC II], because the First Circuit already has held that 'the Wire Act applies only to interstate wire communications related to sporting events or contests.'").

This argument misses the mark.  The relevant test is whether IGT faces a realistic threat of prosecution, not whether it faces the threat of successful prosecution here.  And while the DOJ's concerns about "extending the benefit of . . . First Circuit precedent," Mot. Dismiss 1, might present a prudential reason for the Court to decline to exercise its discretion to issue a declaratory judgment (discussed infra), there is no requirement for standing purposes that an injury occur in the district where relief is sought, or indeed, even in the United States at all. See Cardenas v. Smith, 733 F.2d 909, 913 (D.C. Cir. 1984) ("[T]he location of the injury does not affect [plaintiff's] satisfaction of the Article III standing requirement. . . . An injury endured abroad is not less of an injury for Article III standing purposes because it happened on foreign soil."); see also Siegel v. United States Dep't of Treasury, 304 F. Supp. 3d 45, 52 (D.D.C. 2018) ("The deprivation of property, even when that property is held abroad, constitutes a concrete and particularized injury in fact.").  Indeed, in Lujan, one of the Supreme Court's seminal

standing cases, nothing suggested that a district court in Minnesota could not consider harm to the plaintiff's ability to observe elephants and leopards in Sri Lanka or crocodiles in Egypt because of the locations of those injuries. See Lujan, 504 U.S. at 563-64 (1992). Rather, the Court found a lack of standing because it was too speculative that the plaintiffs would return to those far-flung locations. Id.

Furthermore, the DOJ has provided no authority for its contention that this general proposition – that the location of an Article III injury is irrelevant for assessing standing - changes when that injury is a threatened prosecution by a federal agency against a company operating across many states. This Court has found no authority for that proposition, nor is there any contention that venue is improper in Rhode Island. See Pls.' Reply Supp. Cross-Mot. Summ. J. 3, ECF No. 20. Threatened prosecution anywhere, if likely enough, is a direct harm to these Plaintiffs, who are properly before this Court. And indeed, far from being a "concerned bystander[]," there is no question IGT has a sizable "direct stake in the outcome." Diamond v. Charles, 476 U.S. 54, 62 (1986).

For all these reasons, the Court holds that the threat of prosecution faced by IGT, both for its lottery and non-lottery businesses, is credible enough to meet the requirements of proving

an injury-in-fact.  The DOJ's Motion to Dismiss, ECF No. 14, is therefore DENIED.

B.   Discretion under the Declaratory Judgment Act

"Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995).  Despite an otherwise "'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress," id. at 284 (quoting Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)), the Supreme Court has held that "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration," id. at 288.

Courts have considered a broad array of factors in guiding the exercise of this discretion,[7] but often distill the inquiry

---

[7] See, e.g., Sherwin-Williams Co. v. Holmes Cnty., 343 F.3d 383, 388 (5th Cir. 2003) (analyzing seven, non-exhaustive factors: "(1) whether there is a pending state action in which all of the matters in controversy may be fully litigated; (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist; (5) whether the federal court is a convenient forum for the parties and witnesses; (6) whether retaining the lawsuit would serve the purposes of judicial economy; and (7) whether the federal court is being called on to construe a state judicial

down to two "principal criteria": "(1) [whether] the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) [whether] it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2759 (4th ed.) (collecting cases).

The DOJ argues that "IGT asks this Court to determine the rights of the parties solely as they exist outside the First Circuit," Defs.' Reply 8, and that "any entity that could satisfy the jurisdictional requirements to seek a declaratory judgment in the First Circuit could obtain the benefit of First Circuit precedent outside of the First Circuit, as well, thereby insulating itself from successful prosecution for any non-sports gambling conduct in other jurisdictions."  Mot. Dismiss 1 n.1.  While irrelevant to standing,[8] the Court concludes this argument is better considered as going to the prudence of the Court entering a declaratory judgment.  But even in this more favorable context, the Court ultimately finds the argument unpersuasive.

_____

decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.").

[8] While the government has only made this argument as to standing, the Court must still independently determine, as a prudential matter, whether a declaratory judgment is appropriate here.

First, there is nothing uncommon about a declaratory judgment binding the parties beyond the geographical confines of the district in which it enters.  This is often true, especially when a court sits in diversity, and therefore courts necessarily issues judgments that affect entities in other states.  That both parties here operate nationwide does not turn a declaratory judgment between the parties into a nationwide injunction against the DOJ generally, prevent the DOJ from prosecuting any non-party, or necessarily arrest the development of the law in other circuits.

Furthermore, the DOJ's shift in positions has created substantial uncertainty for broad swaths of IGT's business, which developed under the 2011 OLC Opinion.  Pls.' SUF ¶¶ 11-13.  That uncertainty ripples outward.  Should the DOJ issue guidance ending its deferral period for state lotteries, IGT would have ninety days to substantially revamp or end state lotteries in thirty-seven states.  Id. ¶¶ 13-14.  The First Circuit noted of the lottery in New Hampshire:

> A state-wide operation integrating over a thousand retailers and multi-state relationships to produce almost 100 million dollars in net revenue does not strike us as an operation that can be easily wound-up in ninety days.  Nor can a state legislature plan sensibly if such a relied-upon revenue stream finds itself suddenly subject to a three-month closure notice.

NHLC II, 986 F.3d at 52.  The same concerns echo here, multiplied across thirty-seven states and involving some significant portion

of the 25.3 billion dollars that state lotteries generate for state budgets annually.  See Compl. ¶ 51.

Given these concerns, there is no question that a judgment "will serve a useful purpose in clarifying and settling the legal relations in issue" and afford significant relief "from the uncertainty, insecurity and controversy giving rise to the proceeding."  Wright and Miller, supra, § 2759.  Like the NHLC plaintiffs, IGT "should not have to operate under a dangling sword of indictment while DOJ purports to deliberate without end the purely legal question it had apparently already answered and concerning which it offers no reason to expect an answer favorable to the plaintiffs."  NHLC II, 986 F.3d at 53.  Indeed, the dilemma IGT faces – "between abandoning [its] rights or risking prosecution – is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."  MedImmune, 549 U.S. at 129 (internal quotation marks and citation omitted); see also NHLC I, 386 F. Supp. 3d at 157 ("[W]here an agency has made a definitive interpretation of a criminal law, the Declaratory Judgment Act provides 'a way to resolve the legal correctness of [the] position without subjecting an honest businessman to criminal penalties.'" (quoting Hemp Council, 203 F.3d at 5)).

For these reasons, the Court decides that granting relief here is appropriate.  As for the scope of that relief, both parties have been clear that the relief sought by IGT is the same as that

afforded in the NHLC litigation, and thus a declaratory judgment will bind the United States "everywhere [P]laintiffs operate or would be otherwise subject to prosecution." NHLC I, 386 F. Supp. 3d at 158.[9] Because the Court finds there is no dispute of material fact, judgment shall enter as a matter of law, and Plaintiffs' Cross-Motion for Summary Judgment is GRANTED.

IV.   CONCLUSION

For all these reasons, Defendants' Motion to Dismiss, ECF No. 14, is DENIED and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 16, is GRANTED.  The Court declares that, as to the parties now before it, the Wire Act applies only to "bets or wagers on any sporting event or contest."


IT IS SO ORDERED.

_William E. Smith_

William E. Smith
District Judge
Date: September 15, 2022

---

[9] On appeal, the First Circuit upheld the scope of the relief in NHLC II, noting that it was "responsive to the pleadings and issues presented." NHLC II, 986 F.3d at 62.  Here, both parties have understood the nationwide effect of the relief sought, throughout their pleadings and presentation of the issues.